IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

SHANNON COOK,

                        Petitioner,          **REPORT AND RECOMMENDATION**
                                                   **No. 01-CV-903(RJA)(VEB)**

     -vs-

E.R. DONNELLY, Superintendent,

                        Respondent.

## I.      Introduction

Petitioner Shannon Cook ("Cook" or "petitioner"), through retained counsel Gregory McPhee, Esq. ("McPhee"),[1] filed a petition for a writ of habeas corpus (Docket No. 1) on May 26, 2001, challenging his conviction on May 6, 1996, following a bench trial in Monroe County Court, on charges of second degree (intentional) murder (N.Y. Penal Law § 125.25(1)). Cook is currently serving his indeterminate term of incarceration of twenty years to life. This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for the issuance of a report and recommendation regarding the disposition of Cook's petition. *See* Docket No. 15. For the reasons that follow, I recommend that Cook's petition be dismissed and that no certificate of appealability issue.

## II.      Background

---

[1]      Several items of mail sent to attorney McPhee at his address of record have been returned to the Court as undeliverable, and the telephone number for his law firm is no longer in service. The Court has been completely frustrated in its ability to communicate with McPhee. I have notified Cook of his attorney's dereliction of his obligations to his client and under Rule 5.2 of the Western District of New York's Local Rules, which requires all litigants to provide the Court with correct contact information.  According to the docket, petitioner is and has always been listed as representing himself *pro se* in addition to the listing of Mr. McPhee as retained counsel, and has always received notice of all proceedings.

Cook was convicted following a bench trial before Monroe County Court Judge John Connell of intentionally killing Raphael Hall ("Hall" or "the victim"). At trial, Cook admitted that he killed Hall by shooting him in the chest with a .32-caliber pistol and that before shooting Hall, he shot and killed a pit bull owned by Hall that was in a dog-fight set by Cook, Hall, and others in the City of Rochester on August 20, 1995. At that time, Cook, aged twenty-years-old, lived with his roommate and two pit bull dogs on Cleon Street. Hall lived nearby on Roycroft Street with his fiancee, Shahamma June ("June"), several family members, and four pit bulls. At about 11:15 on the night of the shooting, Cook and his friend William McKenzie, took Cook's two pit bulls over to Roycroft Street to have them fight Hall's dogs. During the ensuing dogfight, Cook shot Hall's pit bull, Goldie. The dog ran a short distance and collapsed, dead. When Hall asked Cook why he had shot his dog, Cook fatally shot Hall in the chest. After Cook shot Hall, he ran home, dropped of his dogs, and fled to Buffalo, where he was arrested ten days later. Although Cook later claimed that he acted in self-defense, at no time did Cook contact the police after the shooting.

The primary issue at trial was whether Cook was justified in using deadly physical force against Hall, who, undisputedly, was unarmed when he was shot. Cook acknowledged that he did not see Hall in possession of any type of weapon when he shot Hall in the chest from a distance of about five or six feet. The trial court rejected Cook's proffered justification defense and found him guilty of intentional murder. The relevant evidence is summarized below.

David Gardner ("Gardner"), a friend of Cook's, testified for the prosecution that he and a person named Byron arranged the dogfight on the night of the incident: While walking down Cleon Street, Gardner and Byron had encountered Cook and another man standing outside with

two pit bills. T.100.[2] At Byron's suggestion, Cook agreed to have dogfight. Gardner and Byron

went to Hall's house to see if he was interested. Hall replied affirmatively, and told Byron to

have Cook and his dogs come over. According to Gardner, later that night Cook appeared in

front of Hall's house with McKenzie and his two pit bulls. A crowd of about ten to fifteen people

gathered in the street to watch the fight. T.109.

Gardner testified that Hall first brought out "Diamond," a pit bull that was larger than

either of Cook's dogs. T.107. Cook said that he would not have his dog fight that one, so Hall

then produced a smaller dog named "Princess." Gardner related that he left the scene briefly to go

to his mother's house around the corner; when he returned, he saw Princess fighting both of

Cook's dogs in the street near the corner of North and Roycroft, across from Hall's house. T.114.

Gardner related that Cook had both of his dogs on one leash, which was about ten feet long, but

Princess (Hall's dog) was unleashed.

Meanwhile, Hall's fiancee, came out of the house with a pit bull puppy named "Goldie,"

who was smaller than Princess. As Goldie joined Princess in the dogfight, Cook told Hall to get

her (Goldie) out of the area. T.114. Gardner testified that Hall bent down and reached for Goldie.

At that moment, Cook pulled out a black handgun and started shooting. T.115. Gardner testified

that Cook fired three shots at Goldie, who ran toward Hall's house, yelping. She collapsed near a

fence and died. At that point, Hall said something to the effect of, "Yo, man, what's wrong with

you?" or "Why did you shoot my dog?" In response, Gardner testified, Cook shot Hall in the

chest. According to Gardner, Hall had raised his hand but was not moving toward Cook when he

was shot. T.120. Gardner related that Cook was about two or three feet away from Hall when he

---

[2]         Citations to "T.___" refer to the trial transcript.

fired the gun and that he did not see Hall in possession of a weapon at any time. Hall staggered

back to his house, collapsing on the front porch. Cook fled with his two dogs.

David Thomas ("Thomas") provided similar testimony as that provided by Gardner.

Before Cook shot Goldie the pit bull, Thomas recalled that Cook told Hall to get his dogs "out of

there." T.61. Thomas testified that Hall bent down and tried to pull his dogs back, but was unable

to do so. At that point Cook started shooting. After Goldie was shot, the victim "walk[ed] around

and asked [petitioner] what he was doing, like he [i.e., the victim] was going to punch him or

something, and then [petitioner] turned and shot Raphael one time." T.22. Thomas testified that

Cook was about five or six feet away from Hall, who did not have anything in his hands when he

was shot. T.23, 27.

Shahamma June ("June"), Cook's fiancee, testified in similar fashion to Thomas and

Gardner. She recalled that Hall had taken Princess inside the house, and that is when Goldie

began fighting with Cook's dogs. T.198. When it appeared that Goldie was "winning," Cook

ordered Hall to "[g]et the dog." T.198. As Hall bent over to pick up Goldie, June saw Cook pull a

gun from his waistband and start shooting. T.199-200. June heard about three or four shots and

saw Goldie running away, covered with blood. T.200. After that, Hall asked Cook why he had

shot his dog. According to June, Cook then turned his gun on Hall and shot him from a distance

of about two to three feet away. June testified that Hall did not have anything in his hands when

he was shot, and had neither threatened Cook nor started moving towards him. T.208, 243-44.

The defense called two witnesses–Derrick Burgess ("Burgess") and Cook. Burgess, who

was Cook's roommate, testified that although he owned one of the two dogs Cook brought to the

dog fight at Hall's house, he did not go over there because he was sick. T.431. Therefore,

Burgess did not observe the dog fight or the shootings. However, Burgess testified, he saw Cook and McKenzie when they left the apartment for the fight. According to Burgess, it was McKenzie who had a .32-caliber pistol in his waistband while Cook was unarmed. T.427, 433.

Cook testified that when the dog fight began, his dog, "Showgirl," was fighting Hall's dog while Cook, McKenzie, Hall, and a group of Hall's friends watched on the street. The dog owned by Burgess, "Patra," was attached to the same leash as Showgirl, but she was not initially involved in the fight between Goldie and Showgirl. T.486. According to Cook, Patra eventually broke free and joined the fight, prompting Hall to ask, "Are you trying to let your dogs jump my dog?" T.487. Cook testified that Hall then released his dog, Princess, who joined in the melee.

Cook testified that all four dogs fought for about 30 seconds. Cook then told Hall to get his dogs or he (Cook) was going to shoot them. T.488. Cook testified that he was "really right in the middle of it 'cause, with the chains coming around my back and being right in front of me, the dogs were fighting. The chains were crossing up, they were by my leg and just all around me. . . . ." T.488. Cook stated that he warned Hall again that if he did not get his dogs he would shoot them. T.489. According to Cook, Hall responded by saying that if his dogs were shot then he would shoot Cook and his dogs. T.489. Cook took the gun that McKenzie was carrying and pointed it at Hall's dog, warning him again to retrieve his dog from the fray. When Hall failed to do so, Cook fired several shots at the pit bull named Goldie. T.22, 490.

After seeing that his dog had been shot, Hall charged at Cook and announced, "I'm going to shoot your motherfuckin' ass." T.491. Hall "went trippin' [sic]. Going wild, really. Hollering." T.494. Cook testified that as Hall came towards him, Hall reached with his right hand near the lower part of his back or side. Cook testified that he thought that Hall was reaching for a gun.

T.492. Cook admitted that he shot Hall once but testified that he did not know where he had shot him. T.493, 530. Cook stated that he believed that Hall was going to kill him, so he then grabbed his dogs and ran away. T.493.

Following closing argument by counsel on March 15, 1996, the court stood in recess. On March 21, 1996, the trial judge announced his verdict of guilty on the sole charge of the indictment–intentional murder. Cook was sentenced on May 6, 1996, to an indeterminate term of twenty years to life, which was less than the maximum possible under New York's Penal Law.

Cook's conviction was unanimously affirmed on direct appeal. *People v. Cook*, 270 A.D.2d 915, 706 N.Y.S.2d 665 (App. Div. 4th Dept. 2000). The Appellate Division rejected Cook's argument that the verdict was against the weight of the evidence on the issue of justification. Since the "uncontroverted evidence" was that the victim was unarmed, the trial court "was entitled to reject the claim of defendant that he believed that the victim was reaching for a gun and that defendant consequently was in fear for his own life." *Id.* (citations omitted) Accordingly, the trial court "was entitled to reject the claim that defendant reasonably believed it necessary to use deadly force to defend himself against the imminent use of deadly force by the victim." *Id.* (citations omitted). The New York Court of Appeals denied leave to appeal. *People v. Cook*, 95 N.Y.2d 795 (N.Y. 2000). Cook's subsequent application for a writ of error *coram nobis* was summarily denied by the Appellate Division. *People v. Cook*, 288 A.D.2d 962, 732 N.Y.S.2d 621 (App. Div. 4th Dept. 2001).

This habeas petition followed on May 26, 2001, in which Cook, through counsel, asserted the following grounds for relief: (1) the verdict was against the weight of the evidence; (2)

"Witness Testimony in the form of Affidavit[3] demonstrating Petitioner acted in self-defense. See Memorandum of Law"; and (3) trial counsel was ineffective based on "[f]ailure to investigate, interview witnesses, examine crime scene. See Memorandum of Law". Petition at 5-6, ¶¶22(A)-(C) (Docket No. 1). On April 19, 2002, Cook, through counsel, filed a memorandum of law (Docket No. 10) in support of the petition in which he elaborated on his claims that trial counsel had been ineffective, and also asserted that appellate counsel had erroneously failed to raise the issue of trial counsel's alleged incompetence on appeal. Respondent answered the petition on July 2, 2002. *See* Docket No. 13.

## DISCUSSION

## AEDPA Review Standard

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. at 68; *see also* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"). Under the federal habeas statute, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") of 1996, a petitioner is entitled to relief from the judgment of a state court only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where the state court has decided the merits of a petitioner's claim, relief may not be granted unless the state court's ruling: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

---

[3]        In reviewing the docket file and the parties' submissions, I was unable to locate the "Witness Affidavit" and it is not amongst the other exhibits attached to petitioner's Memorandum of Law. Moreover, petitioner's counsel did not refer to it in his memorandum of law.

Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1), (2). *See also Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

### Exhaustion and Procedural Default

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that–(A) the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); *see*, *e.g.*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 843-44 (1999); *accord*, *e.g.*, *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994), *cert. denied*, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir.1982) (*en banc*), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723 (1984). This means that the petitioner must have alerted the state appellate court that a federal constitutional claim is at issue. *E.g.*, *Grady v. LeFevre*, 846 F.2d 862, 864 (2d Cir. 1988).

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy*, 455 U.S. 509, 522 (1989). Pursuant to AEDPA, a district court may now, in its discretion, deny on the merits habeas petitions containing unexhausted claims– so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state.").

### Analysis of Claims Raised in the Petition

1.       **Petitioner's claims of ineffective assistance of appellate counsel raised in the Memorandum of Law are unexhausted but should be dismissed under 28 U.S.C. § 2254(b)(2)**

In his memorandum of law (Docket No.), petitioner asserts that his appellate counsel was ineffective in failing to argue (1) that trial counsel was ineffective in failing to register an objection that the prosecution failed to disprove the defense of justification beyond a reasonable doubt, and (2) that trial counsel was ineffective in failing to address certain comments made by the trial judge which allegedly reflected a misunderstanding of the defense of justification. Respondent argues that neither of these claims was raised in petitioner's *pro se* application for a writ of error *coram nobis* and therefore have never been fairly presented to the state courts for review. Because Cook theoretically could return to state court to file a second *coram nobis* application, the claims remain unexhausted. However, because the two claims are plainly without merit, as discussed below, it would be an appropriate exercise of the district court's authority under 28 U.S.C. § 2254(b)(2) to deny these two claims on the merits rather than dismiss the petition as a mixed petition.

The Sixth Amendment guarantees a criminal defendant the "right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). This right to counsel also extends to the prosecution of a direct appeal from a judgment of conviction. *See Evitts v. Lucey*, 469 U.S. 387, 395-96 (1985). To determine whether counsel's assistance was constitutionally effective, the Supreme Court has articulated a two-part test in *Strickland*, 466 U.S. at 687-696. First, a criminal defendant must show that counsel's performance was deficient; that is, that it fell below an "objective standard of reasonableness" measured under "prevailing professional

norms." *Id.* at 687-688. Second, the criminal defendant must affirmatively demonstrate prejudice, by showing that "there is a reasonable probability that but for counsel's [error], the result of the proceeding would have been different." *Id.* at 694. A reasonable probability has been defined as "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Considerable deference is accorded an attorney's performance as counsel for the defendant is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* 466 U.S. at 690.

Appellate counsel's refusal to present every nonfrivolous argument to the appellate court does not constitute ineffective assistance, since appellate counsel is permitted to exercise professional judgment when determining which issues to pursue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). Indeed, the Supreme Court has recognized that truly effective appellate advocacy entails "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id.* at 751-52.

The performance and prejudice prongs may be addressed in either order, and failure to make an adequate showing on one defeats an ineffectiveness claim. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." ); *accord Brown v. Artuz*, 124 F.3d 73, 80 (2d Cir. 1997). Here, on the record before me, it is clear that Cook was not prejudiced by appellate counsel's decision not to argue trial counsel's alleged failures.

First, I turn to trial counsel's failure to object on the basis that the prosecution failed to disprove the defense of justification beyond a reasonable doubt. Appellate counsel did raise

stand-alone claims regarding the weight of the evidence and sufficiency of the evidence.[4] In

affirming Cook's conviction, the appellate court discussed and rejected the weight of the

evidence claim but did not directly address the sufficiency of the evidence. However, a weight of

the evidence analysis is appropriate only if there is legally sufficient evidence to sustain the

verdict. *See People v. Bleakley*, 69 N.Y.2d 490, 495 (N.Y. 1987); *Tibbs v. Florida*, 457 U.S. 31,

43 (1982) ("A reversal based on the weight of the evidence, moreover, can occur only after the

State both has presented sufficient evidence to support conviction and has persuaded the jury to

convict."). Clearly, the New York State law standard is substantially stricter that the

constitutional sufficiency standard. The Appellate Division in Cook's appeal engaged in the more

stringent state law analysis of actually weighing the evidence; in order to get to this analysis, the

court necessarily would have to have found that the evidence was legally sufficient also, even

though there was no such specific finding. Therefore, because trial counsel's failure to object had

no effect on the outcome on of his appeal, he was not prejudiced by trial counsel's alleged

shortcoming. This failure to demonstrate prejudice is fatal to his claim of attacking trial counsel's

---

[4]       When reviewing the sufficiency of the evidence, New York appellate courts view the evidence "in a light most favorable to the People[,] to determine whether there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt." *People v. Steinberg*, 79 N.Y.2d 673, 681-82 (N.Y. 1992). "The standard for setting aside the jury verdict in favor of defendant as against the weight of the evidence requires a finding that the trial evidence so preponderated in favor of [the movant] that a contrary verdict could not have been reached upon any fair interpretation of that evidence." *Borden v. Capital Dist. Transp. Auth.*, 307 A.D.2d 1059, 1063, 763 N.Y.S.2d 860, 864 (App. Div. 3d Dept. 2003) (citation omitted). The "weight of the evidence" analysis also empowers the appellate court to revisit a factfinder's credibility determinations, which is not permitted when merely reviewing sufficiency of the evidence. *See People v. Cantres*, 238 A.D.2d 56, 667 N.Y.S.2d 36 (App. Div. 1st Dept. 1997) (dissenting opn.) ("[A]lthough it is initially the fact finder's prerogative to weigh the evidence and make credibility determinations, and although a large measure of deference is generally due the factfinder on appellate review, weight of the evidence review entails some, albeit circumspect displacement of the factfinder by an intermediate appellate court. . . .") (citing *People v. Bleakley*, 69 N.Y.2d at 495)); *Binder v. Long Island Lighting Co.*, 57 F.3d 193, 201 (2d Cir. 1995) ("To be sure, legal sufficiency is not an issue subject to discretionary judgment, unlike weight of the evidence."), *overruled on other grounds*, *Fisher v. Vassar Coll.*, 114 F.3d 1332 (2d. Cir.1997) (*en banc*), *cert. denied*, 522 U.S. 1075 (1998).

ineffectiveness, which leads me to conclude that Cook was not prejudiced by appellate counsel's failure to raise this nonmeritorious claim on appeal.

Next, I examine Cook's claim that appellate counsel "failed to raise the issue of the trial judge's verbal expressions of doubt about the events of August 20 at the sentencing hearing" when defense counsel made a motion to set aside the verdict. Petitioner's Memorandum of Law at 15-16.  Cook is apparently referring to the trial judge's comment, "I don't know the issue of whether or not Mr. Hall [the victim] carried a gun or not and whether you believed him to carry a gun or not. I don't know the truth or falsity of that."  Sentencing Transcript at 15 (hereinafter, "S.__"). Cook testified that he believed Hall was reaching for a gun, although none of the other witnesses testified that Hall had or displayed a weapon that night. I note that Cook himself admitted on cross-examination that he did not see Hall with anything in his hands at any point that night:

> Q:    Well, prior to this dog – and as Rafael has Princess and then Goldie
>        comes, do you see him with anything in his and?
> A:    No.
> Q:    Do you see any weapon whatsoever near or on Rafael at that time?
> A:    No.
> Q:    At any time from the time you first arrived at 118 Roycroft until the time
>        you let off that shot, did you ever see anything on Rafael?
> A:    No.
> Q:    And you had been with Rafael two days before and had no problems with
>        him; isn't that true?
> A:    Yes.
> Q:    You actually drove around with him for 45 minutes?
> A:    Half an hour, 45 minutes, yes.
> . . .

T.536.  I note that as a matter of New York law, a verdict will not be set aside as against the weight of the evidence unless the trial evidence so preponderated in favor of the prosecution that

a contrary verdict could not have been reached upon any fair interpretation of that evidence. The prosecution is not held to a burden of proving the objective and absolute "truth or falsity" of facts supporting an element of a crime, or disproving facts in support of an ordinary defense. Thus, the judge, as fact-finder, was not required to know with complete certainty whether or not the victim had a gun.

Cook further contends that appellate counsel erred in "fail[ing] to address Judge Connell's remarks about retreating from the scene." Pet'r Mem. at 15-16. The trial judge commented, "Nor was it in my view listening to the testimony an impossible situation for you to leave. Encouragement by others to stick around and have a fight with the dogs is not preventing you from making some decisions and walking away." S.17. According to Cook, this represents a misapprehension by the trial judge regarding the "duty to retreat" provision of N.Y. Penal Law § 35.15.[5] *See* Pet'r Mem. at 16. Based on this comment, Cook infers that the trial judge "appears [to have] . . . felt the obligation to retreat extended to the entire evening, not just at the moment

---

[5]     New York Penal Law § 35.15(1) provides that

[a] person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless:
(a) The latter's conduct was provoked by the actor with intent to cause physical injury to another person; or
(b) The actor was the initial aggressor; except that in such case the use of physical force is nevertheless justifiable if the actor has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened imminent use of unlawful physical force; or
(c) The physical force involved is the product of a combat by agreement not specifically authorized by law.

N.Y. Penal Law § 35.15(1).  Importantly, however, "[a] person may not use deadly physical force upon another person under circumstances specified in [N.Y. Penal Law § 35.15(1)] unless: (a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating . . . ." N.Y. Penal Law § 35.15(2)(a).

of imminent use of deadly force." Pet'r Mem. at 16. Regardless of whether Cook is correct in his assumption, there is no reasonable possibility that it could have made any difference with regard to the verdict of guilty. As the Appellate Division found, the proof at trial was uncontroverted that the victim was unarmed. Moreover, the issue of the "duty to retreat" only is relevant if the defendant's belief as to the imminent use of deadly physical force against him is reasonable. Reviewing the trial evidence in its entirety, a conclusion by the trial judge that Cook reasonably believed the victim was "about to use deadly physical force," N.Y. Penal Law § 35.15(2)(a), against him would not have been reasonable.

Each of these proposed appellate arguments would have added nothing to the overall evidentiary analysis that was competently and thoroughly argued by appellate counsel on direct appeal. Therefore, appellate counsel certainly was not deficient in failing to address these two comments post-verdict comments made by the trial judge during the sentencing hearing, and Cook was not prejudiced by their omission from the brief on appeal as there is no reasonable likelihood of a more favorable outcome had they been included. Accordingly, I recommend that Cook's claims of ineffective assistance of appellate counsel be dismissed.

**2.     Petitioner's claims of ineffective assistance of trial counsel are without merit and should be dismissed.**

Cook contends that trial counsel failed to "object to the prosecution's failure to disprove the petitioner's justification defense beyond a reasonable doubt." Pet'r Mem. at 1. He also faults trial counsel for failing to call certain unnamed witnesses and for failing to call Cook's friend, McKenzie, who accompanied him to the dog fight, to testify. *See* Pet'r Mem. at 8-9. None of these contentions were ever presented to the state court for review and accordingly are

unexhausted. Because there is no time-limit on the filing of a motion to vacate the judgment

pursuant to N.Y. Crim. Proc. Law ("C.P.L.") § 440.10, the typical vehicle for challenging trial

counsel's ineffectiveness, Cook theoretically still has remedies available in the state courts. I

need not address this further, nor consider whether in the alternative the claims should be deemed

exhausted due to their potentially being subject to a procedural default under state law were Cook

attempt to raise them in a C.P.L. § 440.10 motion. Because the claims may be disposed of

expeditiously on the merits, it is appropriate to pursue that course. *See* 28 U.S.C. § 2254(b)(2)

(authorizing a district court to deny unexhausted claims on the merits).

Cook's first contention, related to trial counsel's failure to preserve the issue of whether

the prosecution disproved the defense of justification, was addressed in the context of my

discussion concerning the merits of Cook's ineffective assistance of counsel claim based on the

failure to challenge defense counsel's shortcoming in this regard. It is, for all the reasons I set

forth above, without merit and should be dismissed.

I move next to Cook's contention regarding trial counsel's alleged failure to investigate

and procure witnesses to testify about Hall's alleged threat to shoot Cook's "motherfuckin' ass,"

made after Cook shot his dog. T.491. I note that Cook mentions that one of the prosecution's

witnesses, Thomas, "indicated that he could not hear what was being said." *Id.* (citing T.37).

Cook speculates, "If defense counsel had vigorously attempted to identify and question those

who were standing closer than [David] Gardner [to the dog fight], he *may* have found a witness

to verify Mr. Hall's threat." Pet'r Mem. at 8 (emphasis supplied). That is the extent of Cook's

submissions on this point. Because his claim is totally speculative, it must fail: A petitioner

cannot claim that trial counsel was ineffective in failing to call a witness when the petitioner fails

to provide the Court with what the witness' proposed testimony would have been, let alone who the witness was and whether the individual even would have agreed to testify on behalf of the defense at trial. *See McPherson v. Greiner*, No. 02 Civ.2726 DLC AJP, 2003 WL 22405449, at *25 (S.D.N.Y. Oct. 23, 2003) ("[Petitioner's] claims that trial counsel was ineffective for failing to investigate are conclusory and give no indication as to what exculpatory evidence a proper investigation would have revealed, or how such evidence would have benefitted [petitioner's] case.) (citing *Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990) ("To affirmatively prove prejudice [from counsel's failure to investigate], a petitioner ordinarily must show not only that the testimony of uncalled witnesses would have been favorable, but also that those witnesses would have testified at trial. Moreover, if potential trial witnesses are not called to testify at a postconviction review hearing, the petitioner ordinarily should explain their absence and 'demonstrate, with some precision, the content of the testimony they would have given at trial.'") (citations omitted)). In any event, contrary to Cook's contention here, it is apparent from my review of the trial record that prior to trial defense counsel had investigated the incident prior to trial.

Finally, I turn to Cook's third assertion of error–that trial counsel erroneously failed to call "[t]he one identified witness who was close enough and available to testify for the defense about the verbal exchange, William McKenzie, [who] was willing to provide the defense with exculpatory testimony." Pet'r Mem. at 8. Lacking from Cook's submissions, however, is any indication what the substance of this "exculpatory testimony" would have been. Furthermore, it is only later in Cook's argument that he concedes that McKenzie actually was not available to testify because he had invoked his Fifth Amendment privilege against self-incrimination on the

advice of assigned counsel.

The prosecution had issued a material witness order to procure McKenzie's testimony during the state's case-in-chief at trial, but McKenzie had ignored it. Defense counsel argued that Cook was entitled to a missing witness charge, arguing that the prosecution's "failure to call Mr. McKenzie to refute [petitioner's testimony that McKenzie was in possession of the gun up until the shooting], if nothing else, should be viewed adversely to the People . . . ." T.550. The prosecutor disagreed, having argued the previous day that any testimony by McKenzie would be cumulative to that given by the other prosecution witnesses.

Later that day, McKenzie appeared and agreed to be interviewed by defense counsel. According to defense counsel, during the interview McKenzie essentially recanted his immunized grand jury testimony regarding the murder and dog fight. Defense counsel informed the trial court that while McKenzie's new version "differ[ed] a little bit" from his client's testimony, it "substantially conform[ed] to what [petitioner] said when he testified" and was "substantially different from what Mr. McKenzie gave in a prior written deposition and/or testimony at the grand jury." March 15, 1996 Transcript ("3/15/96 Tr.") at 3. Because he was expecting to call McKenzie as a defense witness, and because McKenzie had apparently changed his account of what he had observed, defense counsel properly determined that it would be prudent to have counsel assigned for McKenzie. *Id.* This was done, and McKenzie declined to testify. The prosecutor objected to defense counsel's request to grant McKenzie immunity from criminal prosecution for possible perjury charges, and the trial judge declined to order the prosecutor to grant immunity, thus effectively eliminating McKenzie as an available witness.

3/15/96 Tr. at 9.[6]

Cook, however, contends that despite McKenzie's invocation of the Fifth Amendment, defense counsel should have called him anyway, arguing that the "privilege against self-incrimination would have been limited to only select questions regarding Mr. McKenzie's actions" and "many of the objective facts incident to the shooting could have been addressed by this eyewitness." Pet'r Mem. at 10. According to Cook, "McKenzie knew the decedent and could have commented on [his] reputation for carrying weapons, supporting violence, and engaging in gang activity." Pet'r Mem. at 10.

As an initial matter, I note that Cook's defense counsel made every effort to secure the testimony of McKenzie, and I cannot fault him for declining to engage in an exercise in futility by making further attempts to have McKenzie testify. First, McKenzie's refusal to testify was categorical–there was no indication that McKenzie would have agreed to be called to the stand and submit to any questioning whatsoever–contrary to what would most likely have been his counsel's advice. Second, Cook's argument that McKenzie could have testified on selective topics is disingenuous, since during the discussion on immunity, the prosecution specifically left open the possibility of prosecuting McKenzie for perjury. The immunity issue, in other words, was not focused on the putatively criminal actions by McKenzie on the night of the incident, but on his truthfulness before the grand jury. Finally, although a victim's prior acts of violence and

---

[6]        I note that the Second Circuit has held that "[o]nly when a prosecutor has abused the government's ability to grant immunity by using it in a discriminatory fashion for the purpose of gaining a tactical advantage does due process require a grant of immunity for a defense witness." *Blissett v. Lefevre*, 924 F.2d 434, 442 (2d Cir.1991). As the record of petitioner's trial does not reveal any such discriminatory use of immunity by the prosecutor, the prosecution was under no duty to grant immunity to McKenzie. *Accord, e.g.*, *Zanghi v. McGinnis*, No. 99-CV-6293CJS, 96-A-5881, 2005 WL 3200279, at *10 (W.D.N.Y. Nov. 30, 2005) (Siragusa, D.J.). Further, "a prosecutor's failure to immunize a witness does not, categorically, give rise to an inference that the witness's testimony would be unfavorable to the government." *United States v. Myerson*, 18 F.3d 153, 159 (2d Cir.1994).

reputation for assaultive behavior are, in some circumstances, admissible when a defendant

asserts the defense of justification, Cook has not established that McKenzie had relevant and

admissible testimony to give on that topic. *See People v. Miller*, 39 N.Y.2d 543, 551  (N.Y.

1976) ("[W]here justification is an issue, [a defendant is permitted] to introduce evidence of the

victim's prior specific acts of violence of which the defendant had knowledge, provided that the

acts sought to be established are reasonably related to the crime of which the defendant stands

charged."). It is not error under New York evidentiary law for trial courts to refuse allow

testimony on victim's prior acts of violence and general reputation for violence in the community

when there is "the absence of any evidence that at the time of defendant's altercation with the

victim, defendant knew of the victim's alleged reputation or was aware of the alleged acts of

violence, the victim's alleged violent disposition is not material to the defendant's justification

defense[.]" *People v. Pizzarro*, 184 A.D.2d 448, 449, 585 N.Y.S.2d 406, 406 (App. Div. 1st Dept.

1992) (upholding trial court's refusal to allow reputation testimony where defendant had failed to

make an offer of proof). Such is the case here. Tellingly, Cook has never come forward with an

affidavit from McKenzie, so I have no indication as to what testimony McKenzie would have

provided regarding acts of prior violence by the victim or the victim's reputation for violence and

whether McKenzie's knowledge of the victim's alleged reputation could be imputed to Cook.

Furthermore, in his memorandum of law, Cook's habeas counsel represents that Hall, the victim,

had a reputation for "promoting violence" and "gang activity." However, much must be read into

Cook's rather ambiguous testimony to come up with these traits about Hall. On direct

examination, in response to defense counsel's question whether, to Cook's knowledge, the victim

was in a gang, Cook testified, "I don't know if you call it a gang, but's a lot of people hanging

around." T.497.  That was the extent of the testimony Cook could offer regarding the reputation

of the victim, whom Cook knew and whom Cook admitted that he "used to visit . . . or stop by

his house and say hello . . ." prior to the shooting. T.538.

For the reasons discussed above, Cook was not prejudiced by the deficiencies he

identifies in trial counsel's performance. Considering the purported errors singly or together,

there is no reasonable possibility that the outcome of the trial would have been different in their

absence. Accordingly, I recommend that Cook's claims of ineffective assistance of trial counsel

be dismissed.

**3.      Petitioner's evidentiary claims should be dismissed.**

Cook states in his habeas petition that "[t]he verdict was against the weight of the

evidence because no rationale [sic] trier of fact could have found petitioner guilty beyond a

reasonable doubt, thus violating petitioner's due process rights." Petition at 5 (Docket No.1).

Although Cook directs the Court to "See Attached Memorandum of Law," he does not address

his evidentiary claims in a stand-alone fashion, but rather does so in the context of trial counsel's

failure to object to the prosecution's failure to disprove his justification defense.

"'[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a

criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia*, 443 U.S. 307,

315 (1979) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). However, "a properly instructed

jury may occasionally convict even when it can be said that no rational trier of fact could find

guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 317. Accordingly, "in a

challenge to a state criminal conviction brought under 28 U.S.C. § 2254–if the settled procedural

prerequisites for such a claim have otherwise been satisfied–the applicant is entitled to habeas

corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of

fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324. Thus, it appears

Cook in his Petition has conflated a "weight of the evidence" claim with the constitutional

standard for legally sufficient evidence. *See Jackson*, 443 U.S. at 315, 317. I therefore will

address both claims.

When assessing a legal insufficiency claim, the reviewing court's "inquiry is whether the

jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded

that the defendant was guilty beyond a reasonable doubt." *United States v. Carson*, 702 F.2d

351, 361 (2d Cir.) (citations omitted), *cert. denied*, 462 U.S. 1108 (1983). This requires viewing

the evidence in the light most favorable to the prosecution, and construing in its favor all

permissible inferences arising from the evidence. *Id.* Notably, the court is not required "ask itself

whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."

*Jackson*, 443 U.S. at 318 (quotation omitted; emphasis in original). "[T]he relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

A court reviewing a sufficiency of the evidence claim is not permitted to revisit the factfinder's

determinations as to the witnesses' credibility and veracity. *See United States v. Strauss*, 999

F.2d 692, 696 (2d Cir. 1993) ("[T]he jury is exclusively responsible for determining a witness'

credibility.") (citing *United States v. Roman*, 870 F.2d 65, 71 (2d Cir.), *cert. denied*, 490 U.S.

1109 (1989)).

In considering a petition for a writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime, or as in this case, the elements of the defense.  *See Green v. Abrams*, 984 F.2d 41, 44-45 (2d Cir.1993). Pursuant to N.Y. Penal Law § 35.15 (1), a person's use of physical force, which would otherwise be criminal, is not criminal if he or she used such force to defend himself or herself or a third person. *E.g.*, *People v McManus*, 67 N.Y.2d 541, 545 (N.Y. 1986). Generally, the force permitted is related to the degree of force reasonably believed necessary to repel the threat. *Matter of Y. K.*, 87 N.Y.2d 430, 433 (N.Y. 1996)). As a matter of New York law, a defendant is not justified in using deadly physical force against an unarmed person. *See*, *e.g.*, *People v. Vecchio*, 240 A.D.2d 854, 658 N.Y.S.2d 720 (App. Div. 3d Dept. 1997) ("[The trial [c]ourt did not err in refusing defendant's request for a justification charge since, under these circumstances, his use of a dangerous instrument against an unarmed individual cannot be viewed as anything other than an excessive use of force, thereby precluding the defense of justification[.]") (citation omitted). Here, Cook admits that he shot the victim in the chest with a .32-caliber pistol and that, at the time, he did not see the victim in possession of a gun or other weapon. In addition, three witnesses testified at trial that at no time during the dog fight did Hall have anything in his hands. These witnesses also contradicted petitioner's assertion that Hall was reaching toward his back when Cook shot him. This evidence was clearly adequate to establish that Cook could not have  "reasonably believe[d]" that he was in imminent danger of having deadly physical force used against him. *See People v. Goetz*, 68 N.Y.2d 96, 115 (N.Y. 1996). Even assuming, *arguendo*, that Hall may have been moving toward Cook with a raised hand, as if to strike him, it did not legally entitle Cook to respond with the use of deadly physical

force. *See People v. Vecchio*, 240 A.D.2d at 855; *People v. Perez*, 213 A.D.2d 682, 683, 624 N.Y.S.2d 199 (App. Div. 1st Dept. 1995) (finding that the prosecution disproved the defense of justification beyond a reasonable doubt of a defendant who claimed that the victim stabbed him a knife and then fell on the knife himself; the prosecution introduced testimony that the victim merely struck the defendant with his bare hands).

Cook cannot meet the "very heavy burden," *id.*, placed on him as a petitioner seeking to prevail on an insufficiency claim. Here, there was more than ample proof to negate Cook's justification defense. Thus, the extent that Cook is asserting a claim of legally sufficient evidence, I recommend dismissing it as without merit.

To the extent that Cook is asserting a claim that the verdict was against the weight of the evidence, such a claim asserts only an error of New York state law, *see People v. Bleakley*, 69 N.Y.2d at 495, for which habeas review is not available, *e.g.*, *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Because Cook's weight of the evidence claim does not assert an error of federal constitutional magnitude, it is not cognizable on habeas review. *Accord, e.g.*, *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence . . ."), *aff'd*, 263 U.S. 255 (1923); *Garrett v. Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) (dismissing claim that conviction was against the weight of the evidence; such a claim is not a basis for habeas relief but presents only an error of state law, for which habeas review is not available); *Douglas v. Portuondo*, 232 F. Supp.2d 106, 116 (S.D.N.Y. 2002) (same). Accordingly, I recommend that it be dismissed.

## CONCLUSION

For the reasons set forth above, I recommend that the petition for a writ of habeas corpus

filed by petitioner be denied. Furthermore, I recommend that no certificate of appealability

should issue with respect to any of petitioner's as he has not made a "substantial showing of the

denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of

appealability may issue . . . only if the applicant has made a substantial showing of the denial of a

constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d

Cir. 2000).

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: February 28, 2008
          Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1ˢᵗ Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

**The Clerk is directed to send a copy of this Order and a copy of the Report and Recommendation (1) directly to petitioner Shannon Cook at Auburn Correctional Facility; (2) to Gregory McPhee, Esq., who is still appears as petitioner's attorney of record; and (3) to respondent.**

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: February 28, 2008
         Buffalo, New York.

-25-